UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CARL DESIMONE,

        Plaintiff,

  v.                                                                           Case No. 08-C-638

BYRAN BARTOW, *et al.*,

        Defendants.

---

**ORDER**

---

Plaintiff Carl DeSimone, who is serving a civil commitment at the Wisconsin Resource Center ("WRC") in Winnebago County, Wisconsin has filed an action under 42 U.S.C. § 1983. Ordinarily, a plaintiff must pay a statutory filing fee of $450 to bring an action in federal court. 28 U.S.C. § 1914(a). DeSimone, however, has requested leave to proceed *in forma pauperis*, pursuant to 28 U.S.C. § 1915. In addition, he has filed a motion to appoint counsel, a request that the Court make and distribute copies of the exhibits he has included with his complaint, and a request for leave to file a motion for a protective order.

Section 1915 is meant to ensure indigent litigants meaningful access to federal courts. *Nietzke v. Williams*, 490 U.S. 319, 324 (1989). An indigent plaintiff may commence a federal court action, without paying required costs and fees, upon submission of an affidavit asserting inability "to pay such fees or give security therefor" and stating "the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress." 28 U.S.C. § 1915(a)(1). DeSimone filed the required affidavit of indigence. Upon review of that affidavit, it appears that he could not pay

the $450 filing fee. Because he is under a civil commitment, as opposed to serving a sentence for a crime, he is not a prisoner within the meaning of the Prison Litigation Reform Act and 28 U.S.C.§ 1915's provisions requiring the assessment and collection of the full filing fee over time do not apply. *West v. Macht*, 986 F. Supp. 1141, 1142 (W.D. Wis. 1997). Thus, *in forma pauperis* status will be granted.

I nevertheless maintain a duty to "screen" all complaints under 28 U.S.C. § 1915(e)(2) to ensure that they comply with the Federal Rules of Civil Procedure and that they state at least plausible claims for which relief may be granted. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007) (citing 5 Wright & Miller § 1216, at 233-234); *see also Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J., sitting by designation) ("Some threshold of plausibility must be crossed at the outset . . . ."). In reviewing a complaint under this standard, the Court must accept as true the allegations of the complaint in question, *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976), construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). The Court is obliged to give the plaintiff's pro se allegations, however inartfully pleaded, a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon him by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

2

**BACKGROUND**

DeSimone has named as Defendants in this case three employees of the WRC where he resides: Director Byran Bartow, Supervisor Scott Allen, and Unit Staff Member Jessy Schneider. According to DeSimone, he maintains journals written in a language he refers to as "Atlantean," which he invented by modifying, for purposes of avoiding copyright infringement, a fictional language known as "Ancient" that was created for television shows "Stargate: SG-1," and "Stargate: Atlantis." (Compl., Ex. 13.) DeSimone has created his own religion, which he refers to as the "Religious Society of Atlantis and the Sanctuary of Yahweh," and his own religious text, which he refers to as the "BOY," or "Book of Yahweh," which seems a translation of the Bible into his Atlantean language. (*Id*., Ex. 13, 15.) DeSimone reports that the content of the journal at issue in this case was not in itself religious in nature, (Compl. 8) but he believes that his right to freely exercise his religion has been impaired because he has now been prevented from writing in his Atlantean language, which he does "in order to become totally Separated from the rest of the world," (*Id*. 6) as he believes he is commanded to do by biblical scripture.

DeSimone claims he was implicitly given permission to write in his journals in his Atlantean language by WRC Social Worker Nancy Seefeldt, who observed him engaging in such writing, invited him to contact her if he needed additional information about the alphabets on which he was basing his own, and then, upon his request, provided DeSimone with copies of updated translations of the fictional "Ancient" alphabet from the internet. (*Id*. at 7-8.) Nonetheless, he claims that on the afternoon of February 19, 2008, during a search by the WRC staff of patient rooms, Defendant Jessy Schneider found a sealed envelope addressed to DeSimone's power of attorney in Arizona and accompanied by a disbursement for extra postage. Schneider opened the envelope without

3

DeSimone's permission, and found it contained one of DeSimone's completed journals and a letter, instructing his power of attorney that the journal was to be stored safely for him. Schneider confiscated the materials. (*Id*. at 3.) DeSimone claims that Defendant Scott Allen has kept possession of these materials from February 19, 2008 to the present. (*Id*. at 4.) In connection with this incident, DeSimone claims that Byran Bartow, the Director of the WRC has failed to properly educate WRC staff with regard to the treatment of outgoing patient mail. (Compl. 19.)

On March 21, 2008, the Defendants held a hearing regarding the confiscated materials, during which Chaplain Robert Kriz determined that the items were not religious in nature. (*Id*. at 5.) Documents DeSimone has attached as exhibits to his complaint reveal that the Defendants consider DeSimone's writings to be contraband that may jeopardize institutional safety. (*Id*., Exs. 8, 9.) DeSimone alleges that since the hearing, Allen has demanded that he stop using the Atlantean language in his writings, and upon his refusal, questioned DeSimone as to whether he still had a period of probation or parole to complete. (*Id.* at 9.) DeSimone interpreted the question as a threat that if he did not stop writing in Atlantean, Allen would revoke his probation or parole. However, he informed Allen he is not on probation or parole. (*Id*.)

According to DeSimone, Allen has the materials (the internet printouts allegedly provided to DeSimone by Seefeldt) necessary to translate the journal, but refuses to do so, claiming it would be too time consuming, and has informed DeSimone of his intention to retain the confiscated materials until the conclusion of this case. (*Id.* at 13.)

DeSimone further alleges that he wrote a letter to the Oshkosh Police Department on February 20, 2008, in which he informed the Department that the Defendants had stolen his mail and journal from his room. According to DeSimone, however, Allen intercepted his letter, and,

4

pretending to write on behalf of the Department, wrote a letter to DeSimone in response, stating that the WRC staff had acted reasonably and had not committed the crime of theft. *(Id.* at 5, Ex. 10.) DeSimone believes that if the letter were really from the Lieutenant of Investigative Services of the Oshkosh Police Department, as it purports to be, the letter would have been signed by that individual and sent using the letterhead of the police department, as opposed to arriving unsigned on plain white paper. By such interference with his mail, DeSimone claims Allen has refused him access to the courts. (Compl. at 5.)

**ANALYSIS**

**I. Opening and Seizure of Outgoing Mail**

DeSimone claims that his constitutional rights were violated when Allen opened his outgoing letter to his power of attorney without permission, and confiscated it. Civil committees and prisoners have a First Amendment right both to send and receive mail. *See Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). However, the Seventh Circuit Court of Appeals has consistently held that searches of outgoing mail are permissible for security purposes, such as searching for contraband, escape plans, and the like. *See Rowe*, 196 F.3d at 782 ("[W]e have upheld regulations authorizing prison officials to inspect incoming or outgoing non-legal mail for contraband against First Amendment challenges."); *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986) ("provisions of this type do not impermissibly intrude on first amendment rights"); *Smith v. Shimp*, 562 F.2d 423, 425 (7th Cir. 1977). Confiscation of prisoner mail is constitutionally permissible "if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Supreme Court has held that "prison officials may properly refuse to transmit encoded messages." *Procunier*

5

*v. Martinez*, 416 U.S. 396, 412-13 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).

Here, DeSimone alleges that Allen opened and searched his outgoing mail, and upon observing encoded writing, confiscated it as contraband. This does not state a claim for a violation of his First Amendment right to send mail.[1]

DeSimone also claims, however, that the Defendants have interfered with his correspondence with the Oshkosh Police Department. DeSimone challenges this conduct as a denial of his access to the courts, but a complaint of denial of access to the courts requires not only that there have been interferences with the plaintiff's ability to communicate with a court, but also that the plaintiff has suffered "actual injury." *Lewis v. Casey*, 518 U.S. 343, 348-49 (1996). Actual injury includes, but is not necessarily limited to, prejudice to contemplated or existing litigation, such as a plaintiff's missing a filing deadline or being foreclosed from presenting a certain claim to the courts. *Id*. at 351. Here, DeSimone has not indicated how the alleged interference with his communications with the Oshkosh Police Department has prejudiced his effort to bring a legal action against the Defendants. Although he alleges that the WRC has not taken any action with respect to complaints he has filed with the institution regarding the incident, because he is not a prisoner, DeSimone is not required to have exhausted such administrative remedies before bringing his federal claim. As such, he has not stated a cognizable claim that he has been denied access to the courts.

---

[1] To the extent DeSimone alleges that the opening of his mail was a violation of state law or institutional policy, his claim still fails, because neither is actionable under Section 1983.

However, if the Defendants confiscated a letter from DeSimone to the Oshkosh Police Department without sufficient justification, their actions may have violated his First Amendment right to send mail. I find that DeSimone has stated a First Amendment claim on that basis.

**II. Free Exercise of Religion**

DeSimone alleges that by forbidding him from writing in his Atlantean language, the Defendants have violated his rights under the First Amendment (as incorporated by the Fourteenth Amendment and made actionable by 42 U.S.C. § 1983) and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") 42 U.S.C. § 2000cc *et seq*.[2]

The First Amendment's Free Exercise Clause protects the right of those in the custody of the state to practice their religion as long as doing so does not unduly burden the institution. *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992). Thus, a regulation that infringes upon such free exercise rights may be valid under the First Amendment "'if it is reasonably related to legitimate penological interests,'" *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir.1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Tarpley v. Allen County, Ind.*, 312 F.3d 895, 898 (7th Cir. 2002).

RLUIPA provides more expansive protection, prohibiting institutions that receive federal funding from substantially burdening an inmate's exercise of religion, even by a rule of general applicability, unless that burden is the least restrictive means of furthering a compelling

---

[2] DeSimone's complaint also invoked the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to bb-4, but that statute is not relevant, because it does not apply to state and local governments. *See City of Boerne v. Flores*, 521 U.S. 507 (1997); *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 400-01 (7th Cir. 2003).

7

governmental interest. *See* 42 U.S.C. § 2000cc-1(a); *Lindell v. McCallum*, 352 F.3d 1107, 1109-10 (7th Cir. 2003). RLUIPA defines "religious exercise" more broadly than the term is defined by traditional First Amendment jurisprudence to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) (comparing the two meanings of "religious exercise"). Thus, that an inmate's beliefs are not affiliated with any organized religion is not in itself necessarily fatal to his claim. *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008).

In this case, DeSimone alleges the Defendants have prevented from writing in his Atlantean language, a practice he maintains is a religious exercise motivated by his religious belief, apparently based on his interpretation of the Bible, that he is to conduct himself in a manner wholly separate from the rest of the world. He claims that the Defendants have forbidden his Atlantean writing because it would take correctional officers too long to translate it, and untranslated it poses a security risk.

Maintaining institutional safety and security is of course a legitimate, and even compelling state interest. Preventing DeSimone from sending writings in a fictional language, or code, to others is a regulation rationally related to maintaining the safety and security of the WRC, and could not form the basis of a claim under the First Amendment. However, DeSimone does not allege that the act of sending his writings to others is a religious exercise. He claims that his writing in Atlantean is itself a religious exercise, and that he has been completely forbidden from writing in Atlantean, not just from communicating in that way with others. It is unclear at this stage of the proceedings whether such a prohibition is appropriately tailored to or supported by sufficient state

8

interests, especially in light of DeSimone's allegations that a social worker at the WRC assisted and implicitly authorized his writing in Atlantean. DeSimone's allegations can be understood to allege that he considers writing in Atlantean as central to his faith, and that the Defendants have targeted his writing, as opposed to the writings of other inmates in foreign languages, because of his uncommon religious beliefs. Thus, Desimone will be permitted to proceed with his claims that by forbidding him from writing in Atlantean, the Defendants violated the First Amendment and RLUIPA.

**III. Retaliation**

DeSimone claims that by questioning him about whether he was on probation or parole, Allen threatened to retaliate against him for refusing to stop writing in Atlantean. But even if DeSimone had a legitimate right to continue his writing, and even if Allen's questions could be understood as an implied threat, DeSimone's allegation fails to state a claim. A retaliation claim brought under § 1983 need not allege conduct that independently violates the Constitution; it is sufficient if the conduct is done with an improper, retaliatory motive. *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005). However, DeSimone alleges only that Allen made a threat to retaliate, not that he took any retaliatory action following through on the threat. He therefore fails to state a retaliation claim.

**IV. Director's Responsibility**

DeSimone claims that Defendant Bartow, the Director of the WRC, failed to properly educate the WRC staff with regard to the treatment of outgoing patient mail. (Compl. 19.)

9

However, to recover under § 1983 a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). An official satisfies the personal responsibility requirement of § 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. *Id*. In other words, the official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye—in short, some causal connection or affirmative link must exist between the action complained about and the official sued in order to recover under Section 1983. *Id*. The doctrine of respondeat superior does not impute liability onto supervisory personnel.

Here, DeSimone has not alleged that Bartow in any way personally participated in the deprivations he alleges. He may not maintain a claim based upon his allegation that Bartow in some way failed to adequately train the WRC staff.

**V. Motion to Appoint Counsel**

DeSimone has also requested the appointment of counsel. Civil litigants do not have a constitutional or statutory right to appointed counsel. *McKeever v. Israel*, 689 F.2d 1315 (7th Cir. 1982). Although 28 U.S.C. § 1915(e)(1) allows courts to "request" that an attorney represent a plaintiff, there is, strictly speaking, no ability or funds to "appoint" counsel in the traditional sense. Therefore, requesting that an attorney provide services free of charge will be the exception rather than the rule, although there are no presumptions for or against the recruitment of counsel. *Pruitt v. Mote*, 503 F.3d 647, 656 (7th Cir. 2007). When confronted with a request under § 1915(e)(1) for pro bono counsel, the Court must consider (1) whether the indigent plaintiff has made a reasonable

10

attempt to obtain counsel or been effectively precluded from doing so; and (2) if so, whether, given the difficulty of the case, the plaintiff appears competent to litigate it himself. *Id*. at 654.

DeSimone does not indicate that he has contacted any attorneys on his own, and his correspondence with the Court to date has not suggested any incompetence. At this stage, his case does not appear to be unusually complex. If, as the case proceeds, it appears more complicated or, for some other reason, DeSimone lacks the ability to effectively represent himself, I may revisit his request for appointed counsel. But on the record now before me, his motion to appoint counsel will be denied.

**VI. DeSimone's Additional Requests**

In addition to the filings addressed above, DeSimone, has requested that the Court compel the WRC to make copies of all the materials relevant to this suit which have been confiscated from him, as well as copies of materials he has filed as exhibits in support of his claim. Alternatively, he requests that the Court at least make copies of the exhibits presently attached to his complaint for service upon the Defendants. To the extent DeSimone seeks to compel the production of documents he believes relevant to his case that are currently in the possession of the Defendants, his request is premature, as discovery has not yet been opened in this case. However, because DeSimone will be granted leave to proceed *in forma pauperis*, the Court will direct the U.S. Marshals to effect service and DeSimone need not submit additional copies of the exhibits he has already submitted in this case. Finally, although DeSimone seeks leave to file a motion for a protective order, he is not required to obtain leave of the Court to do so.

11

## CONCLUSION

Because DeSimone has set forth cognizable constitutional or federal claims, the case will proceed. More particularly, DeSimone may proceed with his claims that Defendant Allen violated his First Amendment right to send mail by intercepting his letter to the Oshkosh Police Department, and Defendants Allen and Schneider violated his right to freely exercise his religion as guaranteed by the First Amendment and RLUIPA by preventing him from writing in his Atlantean language. All other claims are hereby dismissed.

**THEREFORE IT IS ORDERED** that the Plaintiff's request to proceed *in forma pauperis* is **GRANTED**.

**IT IS FURTHER ORDERED** that the U.S. Marshals Service shall serve a copy of the complaint, a waiver of service form and/or the summons, and this order upon the defendant pursuant to Fed. R. Civ. P. 4. Plaintiff is advised that Congress requires the U.S. Marshals Service to charge for making or attempting to make such service. 28 U.S.C. § 1921(b). The current fee for waiver-of-service packages is $8.00 per item. The full fee schedule is provided in 28 C.F.R. § 0.114(a)(2), (a)(3). Even though Congress requires the Court to order service by the U.S. Marshals Service when an impoverished person is permitted to proceed *in forma pauperis*, Congress has not provided for these fees to be waived, either by the Court or the U.S. Marshals Service.

**IT IS ORDERED** that the Defendants shall file a responsive pleading to the Plaintiff's complaint.

**IT IS ALSO ORDERED** that copies of this order be sent to the warden of the institution where the Plaintiff is confined and to Corey Finkelmeyer, Assistant Attorney General, Wisconsin Department of Justice, P.O. Box 7857, Madison, Wisconsin, 53707-7857.

Plaintiff is hereby notified that, from now on, he is required, under Fed. R. Civ. P. 5(a), to send a copy of every paper or document filed with the Court to the opposing parties or their attorney(s). Plaintiff should also retain a personal copy of each document. If Plaintiff does not have access to a photocopy machine, Plaintiff may send out identical handwritten or typed copies of any documents. The Court may disregard any papers or documents which do not indicate that a copy has been sent to each Defendant or to their attorney(s).

Plaintiff is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the clerk of court's office of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Nothing in this order or in § 1915A precludes a Defendant from moving to dismiss any claim identified in this order or potentially existing in the complaint if the Defendant disagrees with my analysis or believes I have overlooked something during my screening.

Dated this __12th__ day of August, 2008.

                                                         s/ William C. Griesbach
                                                       William C. Griesbach
                                                       United States District Judge