UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CARL DESIMONE,

        Plaintiff,

  v.                                     Case No. 08-C-638

BRYAN BARTOW, *et al.*

        Defendants.

---

**MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, a pro se § 1983 litigant residing under civil commitment at the Wisconsin Resource Center ("WRC"), proceeds with two claims. First, DeSimone alleges that his right to send mail was violated when defendants confiscated a letter he sent to the Oshkosh Police Department and wrote a forged response. DeSimone's other claim is that defendants' policy of prohibiting him from writing in the Atlantean language violates his right to freely exercise his religion guaranteed by the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. This matter is before me on defendants' motion for summary judgment. For the reasons stated below, the motion will be granted.

**BACKGROUND**

Plaintiff has named as defendants in this action three employees of the WRC where he resides: Director Bryan Bartow, Psychiatric Care Supervisor Scott Allen, and Psychiatric Care Technician Jesse Schneider. (Compl.; Defs.' PFOF ¶¶ 1-2.) On February 19, 2008, Schneider and

other WRC staff conducted a routine search of DeSimone's cell, which yielded a sealed envelope and other documents containing cryptic writing unknown to the WRC staff. (Defs.' PFOF ¶ 23.) The writings were in a language which is not an authorized form of communication at the WRC. (*Id*. at ¶ 24.) WRC staff confiscated two journals, a letter, two note pads, and seven separate sheets of paper written in the unknown language. (*Id*. at ¶ 26.) After the materials were brought to Allen's attention, he questioned DeSimone about the writings. (*Id*. at ¶ 27.)

After questioning DeSimone, Allen confiscated the materials and authorized the WRC's chaplain, Jose Paba, to review the materials. (*Id*. at ¶ 28.) Allen told DeSimone that the writings were deemed contraband until further inquiry into the matter could be made. (*Id*. at ¶ 29.) DeSimone offered to interpret the writings for Allen, though the parties dispute when this occurred, with DeSimone maintaining it was before confiscation and review by Paba, and Allen claiming it was after confiscation. (*Id.* at ¶¶ 27, 30; Pl.'s Resp. to Defs.' PFOF ¶ 27; Aff. of Scott Allen at ¶¶ 11, 15.) In any event, the chronology is not material. Along with providing Paba with the writings, Allen informed the institution unit supervisor of what had occurred and documented the incident by completing a Client Rights Limitations and /or Denial Document. (Defs.' PFOF ¶¶ 31-32.)

Chaplain Paba reviewed the writings taken from DeSimone's cell and concluded that the cryptic writings were in the Atlantean alphabet.[1] (*Id.* at ¶¶ 33-34.) DeSimone has provided the Court with examples of his writings, which he claims are nothing more than transliterated characters

---

[1] The parties have different views regarding the origin of the Atlantean alphabet, as defendants contend it was created for the television program Stargate Atlantis, while DeSimone argues for its antiquity in his claim Atlantean "predated Latin." (Aff. of Jose ¶ 20; Pls.' Resp. to Defs.' PFOF ¶ 34.)

in a Lingua Anquietas computer font obtainable without charge on the Internet.[2] (Doc. # 62.) Paba researched the matter and noted that DeSimone's stated religion did not use the Atlantean language as its primary language. Paba's understanding of DeSimone's stated religion was based upon the Religious Preference Notice DeSimone completed on January 2, 2006, on which form DeSimone designated his religious preference as "Jewish" and checked the "Other" box, specifying "Yahwism." (Aff. of Jose Paba ¶ 9, Ex. 102.) DeSimone told Paba that he used Atlantean in his personal journal because he did not want anyone to be able to read it. (Defs.' PFOF ¶ 35.)

DeSimone sent a letter to the Oshkosh Police Department dated February 20, 2008, the day after Allen confiscated DeSimone's writings. In the letter DeSimone alleged that Allen had stolen his religious and legal documents. (*Id.* at ¶ 52.) Although DeSimone alleged in his complaint that Allen confiscated the letter before it was placed in the mail and forged a response, DeSimone now does not dispute that the letter was received by the Oshkosh Police Department and investigated. (*Id.*) The investigation determined that WRC staff were following institutional policy and that no crime had occurred. (Aff. of Jim Busha, Ex. 101 at 3.)

On March 21, 2008, WRC staff held a hearing regarding the confiscated materials which Paba, Institution Unit Supervisor Robert Kriz, Schneider, Allen and DeSimone attended. (Defs.' PFOF ¶ 36.) At the hearing DeSimone claimed that the writings were in the Atlantean language and constituted an expression of his religious beliefs. (*Id.* at ¶ 37.) The WRC staff conveyed to DeSimone that his stated religion does not use the Atlantean language as its primary language. (*Id.* at ¶ 38.) WRC staff considered the writings to be a security risk, as they saw a potential that the

---

[2]According to DeSimone Anquietas is a printed alphabet, whereas Atlantean is in handwritten, cursive script. (Pl.'s Br. in Opp. at 5.)

3

language could be used as a means to communicate in code. (*Id*. at ¶ 39.) The security concern relates to the fact WRC staff cannot readily ascertain the contents of a writing, which could serve as a medium to communicate information related to WRC staff, plans for escape, or plans for group resistance. Chaplain Paba determined that the materials were not religious in nature but contraband. (*Id*. at ¶ 40.)

**ANALYSIS**

**I. Principles Governing Summary Judgment**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e);

4

*Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322.

**II. Right to Send Mail**

DeSimone alleged in the complaint that WRC staff violated his First Amendment right to send mail by confiscating a letter he had mailed to the Oshkosh Police Department. (Compl. at 7.) DeSimone has apparently abandoned this claim, as he has not disputed the evidence adduced by defendants indicating that the Oshkosh Police Department received his letter and even investigated his allegation against Allen. (Pl.'s Resp. to Defs.' PFOF ¶¶ 51-52.) Because the undisputed facts show that the defendants did not violate DeSimone's right to send mail, summary judgment will be entered in favor of defendants on the claim.

**III. Claim under RLUIPA and the First Amendment**

DeSimone also proceeds with a claim that defendants violated RLUIPA and his First Amendment right to freely exercise his religion. Specifically, DeSimone claims that defendants have prevented him from writing in Atlantean, a practice he maintains is a religious exercise

5

motivated by his religious belief that he is to conduct himself in a manner wholly separate from the rest of the world. Although DeSimone acknowledges that Atlantean itself is not a sacred language of Yahwism or integral to its practice, DeSimone has adopted its usage in an effort to follow the teachings of his faith by setting himself apart from those with whom he resides at the WRC.

The First Amendment's Free Exercise Clause protects the right of those in the custody of the state to practice their religion as long as doing so does not unduly burden the institution. *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992) (citing *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990)). Thus, a regulation that infringes upon such free exercise rights may be valid under the First Amendment "if it is reasonably related to legitimate penological interests," *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Tarpley v. Allen County, Ind.*, 312 F.3d 895, 898 (7th Cir. 2002).

RLUIPA provides more expansive protection, prohibiting institutions that receive federal funding from substantially burdening an inmate's exercise of religion, even by a rule of general applicability, unless that burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a); *Lindell v. McCallum*, 352 F.3d 1107, 1109-10 (7th Cir. 2003). RLUIPA defines "religious exercise" more broadly than the term is defined by traditional First Amendment jurisprudence to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) (comparing the two meanings of "religious exercise"). Thus, that an inmate's beliefs are not affiliated with any organized religion is not in itself necessarily fatal to his claim. *Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008).

In order to prove a violation of RLUIPA, the inmate bears the burden of establishing that the defendants placed a substantial burden on the exercise of his religious beliefs. 42 U.S.C. § 2000cc-2(b). While RLUIPA itself does not define the term "substantial burden," the Seventh Circuit has held that a substantial burden is "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers*, 342 F.3d at 761; *see also Cutter v. Wilkinson*, 544 U.S. 709, 720 (finding RLUIPA compatible with the Establishment Clause because it alleviates "exceptional government-created burdens on private religious exercise."). An inmate's "unreasoned say-so" is insufficient to demonstrate a substantial burden on his religious exercise. *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006).

Once the inmate has shown that actions of government officials have substantially burdened the exercise of his religious beliefs, the burden shifts to the defendants to demonstrate the burden was the least restrictive means of furthering a compelling government interest. *Kaufman v. Schneiter*, 474 F. Supp. 2d 1014, 1025 (W.D. Wis. 2007) (citing *Murphy v. Zoning Comm'n of the Town of New Milford*, 148 F. Supp. 2d 173, 187 (D. Conn. 2001); *see also* 42 U.S.C. § 2000cc-2(b).

**A. Substantial Burden**

DeSimone fails to meet his burden under RLUIPA to demonstrate that the WRC's policy of restricting him from writing in Atlantean is a substantial burden on his right to freely exercise his religion. To show a substantial burden, DeSimone must designate facts indicating that the policy prohibiting his writing in Atlantean makes his religious exercise "effectively impracticable." *Civil Liberties for Urban Believers*, 342 F.3d at 761. DeSimone claims that his writings are his

7

"primary religious expression of conscience," that his religious conscience compels him to write his journals in Atlantean as a means of separating himself from "those who practice Unrighteousness, Unholiness . . . people who practice Evil every single day in this institution." (Aff. of Carl DeSimone ¶¶ 8, 10.) DeSimone notes that his journal-writing is a key aspect to how he practices his religion, as the journals are his "private Worship, Praise and Prayers," and that keeping such a journal is out of a desire "to obey my Heavenly father Yahweh as he has commanded me in the Book of Yahweh." (*Id.* at ¶¶ 10, 12.)

Though DeSimone provides much about his own motivation for writing in Atlantean, missing from the record is any indication that writing in Atlantean is an essential aspect of the Yahwist faith to which he adheres. To the extent the materials DeSimone has filed as exhibits to his affidavit opposing summary judgment are an accurate reflection of the tenets of belief of the Yahwist faith, it is clear that Yahwism exhorts its followers to separate themselves from the world and be vigilant against syncretism.[3] But DeSimone presents no evidence that one cannot effectively practice Yahwism without writing in Atlantean. Instead, he merely claims that writing in Atlantean is the only way he is able to separate himself from his peers at the WRC, whose activities and speech he considers corrupt.

DeSimone admits that neither of the two religions identified on his religious preference card submitted on January 2, 2006, Judaism or Yahwism, use Atlantean as a primary language. (Pl.'s Resp. to Defs.' PFOF ¶ 38.) Further, he admits that there is nothing inherently religious about the Atlantean alphabet itself. (*Id.* at ¶ 35.) Thus, DeSimone can point to nothing in either of his

---

[3]For example, the literature DeSimone submits cautions against using the word "cereal," given its association with the Roman goddess Ceres. Instead, the literature recommends using "breakfast food." (Doc. # 64.)

8

designated faiths which requires him to use the Atlantean language; rather, he has elected to write in the cryptic language in an effort to realize the call of his faith to separate himself from those he deems unrighteous. In other words, there is no evidence that one cannot practice Yahwism and its teachings about remaining separate without writing personal journals in Atlantean. DeSimone's "unreasoned say-so" that this is the case is not enough to show that the restriction placed upon him by WRC policy has made it effectively impracticable for him to exercise religious beliefs. Thus, DeSimone has failed to show the substantial burden that RLUIPA requires, which entitles defendants to summary judgment on the RLUIPA claim.

**B. Least Restrictive Means**

Even if he could show that the proscription against writing in Atlantean substantially burdens his right to freely exercise his religion, the undisputed facts show that the WRC policy was the least restrictive means of advancing a compelling governmental interest, security at the WRC. "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. Application of the "compelling governmental interest" standard of RLUIPA must be made with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (citation omitted). Concerns of security are to be given "particular sensitivity." *Id.* at 722.

Here, DeSimone was writing using the Atlantean alphabet. Though he maintains that it is not really a foreign language inasmuch as he simply transliterates the characters of the English

9

alphabet with those of the Atlantean, the text is cryptic. The WRC staff's concern regarding the potential that these cryptic writings could be the medium for communicating escape plans or group resistance plots is well-founded, notwithstanding DeSimone's protestation that he is not the sort of patient who would cause trouble. Further, even though DeSimone has expressed a willingness to provide the WRC staff with a key to aid in translating his writings into English, such an arrangement would not be consistent with an efficient use of the human limited resources available to the WRC.[4] (Defs.' PFOF ¶ 44.) The security of the WRC is a compelling governmental interest, and permitting DeSimone to write in an unintelligible language capable of serving as a medium of encrypted communication with other WRC residents is a threat to that interest. Under these facts the WRC policy prohibiting such writings is the least restrictive means of attending to this interest, as case-by-case review of everything DeSimone elects to write in the Atlantean language would be a significant drain on the human resources of the WRC.

## CONCLUSION

As DeSimone has abandoned his claim that defendants confiscated his letter to the Oshkosh Police Department, summary judgment will be entered for defendants on the claim. While DeSimone's religious conscience may impel him to separate himself from his peers at the WRC through writing in an alien alphabet, he has failed to designate specific facts to show that the proscription on writing in Atlantean creates a substantial burden on his right to exercise his religion.

---

[4]DeSimone cites two cases dealing with restrictions on non-English communications and publications in prisons, *Thongvanh v. Thalacker*, 17 F.3d 256 (8th Cir. 1994), and *Kikumura v. Turner*, 28 F.3d 592 (7th Cir. 1994). (Pl.'s Br. in Opp. at 1.) Both are inapposite to the facts here, however, as these cases involved inmates whose native languages were not English and wished to receive mail written in their native languages.

Further, even had DeSimone came forward with evidence that his inability to journal in Atlantean makes the exercise of his Yahwist faith effectively impracticable, the undisputed facts indicate that the policy prohibiting writing in Atlantean is the least restrictive means available to advance a compelling governmental interest. DeSimone's claim under RLUIPA therefore fails. As RLUIPA provides more generous protection that the First Amendment, his constitutional claim also fails. Defendants' motion for summary judgment is **GRANTED**.

    **SO ORDERED** this   10th   day of June, 2009.

                                        s/ William C. Griesbach
                                        William C. Griesbach
                                        United States District Judge